CAROL COFFEY, PERSONAL REPRESENTATIVE OF THE ESTATE
OF EDWARD COFFEY, DECEASED, APPELLEE, V.
WALDINGER CORPORATION, APPELLANT.

649 N.W.2d 197

Filed July 9, 2002.   No. A-01-1120.

David S. Houghton and William G. Garbina, of Lieben, Whitted, Houghton, Slowiaczek & Cavanagh, P.C., L.L.O., for appellant.

Michael P. Dowd, of Dowd & Dowd, for appellee.

IRWIN, Chief Judge, and INBODY and CARLSON, Judges.

CARLSON, Judge.

## INTRODUCTION

Waldinger Corporation (Waldinger) appeals from an award granted to Carol Coffey, personal representative of the estate of Edward Coffey, deceased. This award was entered by a trial judge of the Workers' Compensation Court and affirmed as modified on appeal by a review panel of the Workers' Compensation Court on September 10, 2001. For the reasons set forth below, we affirm.

## BACKGROUND

On January 16, 2001, Carol filed an amended petition, stating that on or about July 17, 2000, Edward was killed in an accident arising in and out of the course of his employment with Waldinger. Carol alleged that Waldinger had notice and knowledge of Edward's accident, injury, and death on July 17. Carol stated that Edward's accident or injury occurred when Edward was traveling from an assigned parking lot to the Waldinger worksite, when he was struck and killed by an automobile. Carol sought death benefits, together with payment of funeral expenses.

On January 25, 2001, Waldinger filed an answer, stating that when Edward was involved in the accident, Edward may not have been at a place where either his duties were being performed or his services required his presence. Waldinger also stated that Edward's accident may not have arisen out of and in the course of his employment, but may have arisen from an independent hazard created by Edward. Waldinger requested that Carol's petition be dismissed.

A hearing was held on March 14, 2001. The following facts are uncontested: In the summer of 2000, construction was taking place on a project called the Omaha World-Herald Freedom Center (World-Herald). A parking garage for the World-Herald project was being built on the east side of 13th Street in downtown Omaha. On the west side of 13th Street, a new building was being built for the printing of newspapers. Peter Kiewit and Sons, Inc. (Kiewit), was the general contractor on the World-Herald project, and Waldinger was one of the subcontractors. Kiewit fenced an area east of 13th Street and north of the parking garage under construction. This fenced area held some of Waldinger's construction materials. The fenced area also included space for

75 to 100 automobiles. This fenced parking lot was not open to the public, but was restricted to onsite workers, the number of which was as many as 250 in the summer of 2000.

On July 17, 2000, Edward was employed as a plumber by Waldinger. On that date, Edward parked his vehicle in the fenced lot and was crossing 13th Street from east to west in order to reach one of Waldinger's trailers and report to work. At approximately 5:32 a.m., Edward was struck and killed by a motor vehicle driving northbound on 13th Street. Edward was scheduled to start work at 6 a.m.

Becky Smith, a plumber, testified that she was working for Waldinger at the time of Edward's death. Smith testified that during the summer of 2000, she worked on the World-Herald project. Smith testified that there was no place to park on 13th Street itself. Smith testified that Mike Fruehwald, a foreman with Waldinger, told her to park in the fenced lot. Smith testified that directly across the street from the fenced lot was a Waldinger trailer where employees were required to meet in the morning. Smith testified that commonly, employees who parked in the fenced lot would walk directly across 13th street to gain access to the Waldinger trailers.

Smith testified that the fenced lot was a restricted area and that cars that did not belong in the lot would be towed. Smith testified that to park in the lot, she was required to give Fruehwald the make, model, and license plate number of her vehicle. Smith testified that it was generally difficult to get a parking spot in the fenced lot unless one arrived at work early. Smith stated that it was not unusual for plumbers to arrive at work 15 to 30 minutes early. Smith also testified that besides finding it difficult to find a place to park, she was required to be at work a few minutes early to discuss her job assignment for the day.

On cross-examination, Smith testified that prior to Edward's death, some Waldinger employees parked in locations other than the fenced lot. Smith testified that there was some parking space on 12th Street near the jobsite as well as on various other streets surrounding the World-Herald project. The record shows that Waldinger employees were allowed to park in the fenced lot for free but would not be reimbursed if they paid to park elsewhere.

Cory Pemperton testified that he was a journeyman plumber employed by Waldinger at the time of Edward's death. Pemperton testified that he parked in the fenced lot for a while. Pemperton testified that the fenced lot was the designated parking place, but that at times, there was no room in the lot for him to park. Pemperton testified that Fruehwald directed him to park in the fenced lot and that when he parked in the fenced lot, he walked directly across the street to the Waldinger trailers. Pemperton further testified that there was an underground tunnel leading from the fenced lot to the other side of 13th Street, but that this tunnel was inaccessible at the time of Edward's death.

Pemperton testified that there were signs on the outside of the fenced lot indicating that the lot was a restricted area. Specifically, the record shows that a sign on the fence surrounding the lot stated, "construction area" and "unauthorized personnel keep out." Pemperton testified that Waldinger stored materials in the fenced lot and that at various times throughout the day, he would have to cross 13th Street in order to retrieve those materials.

Pemperton testified that he usually arrived at work approximately 15 to 20 minutes early in order to find parking and find out his job assignment for the day. Pemperton testified that although Waldinger did not require its employees to park in the fenced lot, they were encouraged to do so.

Henry Coran, also a journeyman plumber, testified that he was working for Waldinger on the date of Edward's death. Coran testified that when he first came to work, Fruehwald instructed him to park in the fenced lot and asked for a description of his vehicle. Coran testified that if one did not get to work very early, one could not get a space in the fenced lot. Coran testified that he typically arrived at work at 5:30 a.m. Coran testified that he did so to find a decent parking space in the fenced lot. Coran also testified that for 5 or 10 minutes prior to 6 a.m., the workers discussed their job assignments with their foreman.

Two other plumbers, Tom Ricceri and Robert Wonder, testified that they were also working for Waldinger on the World-Herald project at the time of Edward's death. Both gave testimony similar to that of the plumbers who testified before them. Both testified that they were told by Fruehwald to park in the fenced lot and

that they did park in that lot. Ricceri testified that he arrived at work 20 to 25 minutes early, and Wonder testified that he generally arrived anywhere from 15 to 30 minutes early. Both Ricceri and Wonder testified that they had to be at work prior to 6 a.m. to discuss their job duties with their foreman.

Wonder testified that there was a crosswalk located at the intersection of 13th Street and Capitol Avenue. Wonder testified that he could have walked down to Capitol Avenue when he arrived at work, crossed the intersection of 13th Street and Capitol Avenue, and then walked to the Waldinger trailers, but that he did not. Wonder testified that he always walked directly across 13th Street to the work trailers. Wonder testified that he never saw any Waldinger employee walk down to the intersection of 13th Street and Capitol Avenue and cross at the crosswalk.

Daryn Dimmitt testified that he was one of Waldinger's foremen working on the World-Herald project in the summer of 2000. Dimmitt testified that Fruehwald also instructed him to park in the fenced lot. Dimmitt testified that he commonly walked directly across 13th Street to reach the work trailers. Dimmitt testified that he never saw an employee walk a block up 13th Street, cross at Capitol Avenue, and walk back down a block to the work trailers. Dimmitt also testified that he never encouraged Waldinger employees to take the latter route. Dimmitt testified that he instructed Edward to park in the fenced lot. Dimmitt testified that the fenced lot was sponsored by Kiewit.

Dimmitt testified that it was common practice for Waldinger employees to arrive early to work. Dimmitt testified that prior to the usual summer 2000 start time of 6 a.m., he would discuss with the employees who was working where and what materials they required. Dimmitt testified that the employees did not get paid for being on the jobsite prior to 6 a.m. Dimmitt testified that he expected the employees to be at work prior to 6 a.m. and that if they showed up at 6 a.m., they were considered late. Dimmitt testified that he generally arrived at work 15 minutes early.

Fruehwald testified that he is a foreman for Waldinger and supervised the World-Herald project. Fruehwald testified that Kiewit was the general contractor for the World-Herald project and that Kiewit controlled both the project and the worksite.

Fruehwald testified that Waldinger was under Kiewit's control and direction.

Fruehwald testified that generally, Waldinger plumbers were to report to their work trailer at 6 a.m. Fruehwald testified that he did not meet with any of the plumbers prior to 6 a.m., but he could not say whether other foremen spoke to employees about their job assignments prior to 6 a.m.

Fruehwald testified that Waldinger employees were free to park wherever they wanted, including within the fenced lot. Fruehwald testified that he typically told Waldinger employees to park in the fenced lot on their first day of work, with the aim of making it easier for them to find the jobsite. Fruehwald testified that Kiewit passed out parking passes so that if employees continued to park in the fenced lot, Kiewit would know which employees were parking there. Fruehwald testified that that way, if a car had to be moved, the corresponding employee could be contacted. Fruehwald testified that the passes also helped keep nonemployees out of the lot.

Fruehwald testified that at no time did he instruct Waldinger employees not to cross 13th Street from the fenced lot to the work trailers. Fruehwald testified that he himself crossed 13th Street to get to the trailers. Fruehwald also testified that crossing 13th Street was the common route utilized by Waldinger employees to get to work.

Donald Holoubek testified that he is a sheet metal worker employed by Waldinger. Holoubek testified that he worked on the World-Herald project in July 2000. Holoubek testified that while working on the World-Herald project, he was never directed by Waldinger to park in a specific location. Holoubek testified that although he was made aware of available parking in the fenced lot, he usually parked elsewhere.

In an order filed March 21, 2001, the trial court found that Edward's accident arose out of and was in the course and scope of Edward's employment with Waldinger. The trial court also found that Edward was not willfully negligent, causing his own death. The trial court ordered Waldinger to pay Carol $487 per week after July 17, 2000, and to pay Carol funeral expenses totaling $6,766.85. The trial court stated that the weekly payment of $487 should continue for the remainder of Carol's life

unless Carol remarries. In that event, Carol should receive 2 years' indemnity benefits in one lump sum as provided for in Neb. Rev. Stat. § 48-122.01(3) (Cum. Supp. 2000).

Waldinger appealed to the review panel. The review panel held a hearing on August 7, 2001. In an order filed September 10, 2001, the review panel supported the trial court's order except for the award of funeral expenses in the amount of $6,766.85. The review panel stated that Neb. Rev. Stat. § 48-122(3) (Reissue 1998) sets a statutory maximum of $6,000 for burial expenses and therefore affirmed the trial court's order as modified, setting the award of funeral expenses at $6,000 instead of $6,766.85. Waldinger appeals.

### ASSIGNMENTS OF ERROR

On appeal, Waldinger contends that the trial court erred as a matter of law in finding that (1) Edward's fatal accident arose out of his employment with Waldinger, (2) Edward was acting in the course and scope of his employment at the time of his injury and death, and (3) Edward was not willfully negligent in jaywalking across 13th Street.

### STANDARD OF REVIEW

An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Schwan's Sales Enters. v. Hitz*, 263 Neb. 327, 640 N.W.2d 15 (2002).

In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of fact of the single judge who conducted the original hearing; the findings of fact of the single judge will not be disturbed on appeal unless clearly wrong. *Id.* An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Green v. Drivers Mgmt., Inc.*, 263 Neb. 197, 639 N.W.2d 94 (2002).

## ANALYSIS

On appeal, Waldinger contends that the court erred as a matter of law in finding that Edward's fatal accident arose out of and in the course of his employment with Waldinger.

Neb. Rev. Stat. § 48-101 (Reissue 1998) compensates injury caused an employee by an accident arising out of and in the course of his or her employment. *La Croix v. Omaha Public Schools*, 254 Neb. 1014, 582 N.W.2d 283 (1998), citing *Johnson v. Holdrege Med. Clinic*, 249 Neb. 77, 541 N.W.2d 399 (1996).

■ The phrases "arising out of" and "in the course of" in § 48-101 are conjunctive; in order to recover, a claimant must establish by a preponderance of the evidence that both conditions exist. *La Croix v. Omaha Public Schools, supra*, citing *Cox v. Fagen Inc.*, 249 Neb. 677, 545 N.W.2d 80 (1996), and *Johnson v. Holdrege Med. Clinic, supra.*

■ The phrase "arising out of," as used in § 48-101, describes the accident and its origin, cause, and character, i.e., whether it resulted from the risks arising within the scope of the employee's job; the phrase "in the course of," as used in § 48-101, refers to the time, place, and circumstances surrounding the accident. *La Croix v. Omaha Public Schools, supra*, citing *Cox v. Fagen Inc., supra*, and *Johnson v. Holdrege Med. Clinic, supra.*

■ Under *La Croix v. Omaha Public Schools*, the going to and from work rule as currently applied in Nebraska is that injuries sustained by an employee while going to and from work do not arise out of and in the course of employment unless it is determined that a distinct causal connection exists between an employer-created condition and the occurrence of the injury.

Prior to the Supreme Court's decision in *La Croix v. Omaha Public Schools*, Nebraska adhered to a bright-line version of the going to and from work rule. This rule stated that an injury sustained by an employee while going to and from work, at a fixed place of employment, did not arise out of and in the course of employment.

Waldinger argues that the trial court erred in awarding Carol benefits because a distinct causal connection did not exist between a condition created by Waldinger and the occurrence of Edward's injury. We disagree.

In *La Croix v. Omaha Public Schools*, the plaintiff brought a workers' compensation action seeking compensation for injuries she incurred when she fell in a parking lot that was not owned by her employer, but in which the employer encouraged her to park her vehicle. The employer also provided transportation to the workplace from this lot. A single judge of the Nebraska Workers' Compensation Court dismissed the plaintiff's petition based on the bright-line premises rule set out by the Nebraska Supreme Court in *Johnson v. Holdrege Med. Clinic, supra.* A review panel of the Workers' Compensation Court affirmed. The Supreme Court concluded that there was a distinct, causal connection between the employer's sponsoring of the parking lot and the occurrence of the plaintiff's injury and therefore reversed, remanding the cause for further proceedings. In doing so, the Supreme Court stated:

> [T]he employer in the instant case encouraged or instructed employees to park in the Dill Field lot, which was often the only parking area available. Most importantly, the employer specifically provided transportation to the workplace from the lot. By providing transportation, the employer created a condition under which its employees will necessarily encounter hazards while traveling to the premises where they work. Thus, there is a distinct, causal connection between the employer's sponsoring of the parking lot and the occurrence of [the plaintiff]'s injury. Accordingly, because such a causal connection was present in the instant case, the injury to [the plaintiff] arose out of and in the course of her employment.

*La Croix v. Omaha Public Schools*, 249 Neb. 1014, 1019, 582 N.W.2d 283, 286 (1998).

Waldinger points to the Supreme Court's findings in *La Croix v. Omaha Public Schools* and suggests that there was no employer-created hazard in the instant case because Waldinger did not provide transportation to the Waldinger trailers from the fenced lot.

The trial court disagreed, and in its order finding that Edward's injuries arose out of the course of his employment, the trial court stated:

There are similarities in the facts of the instant case to that of La Croix, supra. The employees were encouraged to park in the fenced lot. Parking in the fenced lot allowed the employees to park in close proximity to the work site. No transportation to the work site was required. The fenced area was adjacent to the parking garage under construction and immediately across the street from the printing plant part of the construction project. It is also noteworthy that Waldinger Corporation stored materials here which were retrieved from time to time by its employees. [Waldinger] made a point of establishing at trial that Kiewit erected the fence and issued the parking passes. Control of the lot in question is not necessarily determinative of the issue at hand, however. The Court notes that the City of Omaha owned and presumably controlled the parking lot used by the plaintiff in La Croix. Thus the Court concludes that Edward Coffey's fatal accident while traversing 13th Street from the fenced parking lot to the Waldinger work trailers located to the west of 13th Street was an accident arising out of his employment.

We conclude that the trial court's conclusion was not wrong as a matter of law. The record shows that Waldinger encouraged its employees to park in the fenced lot. Several employees testified at trial that they always walked directly across the street to reach the Waldinger trailers. Waldinger's supervisors testified that they took the same route. Although there was a tunnel leading from one side of 13th Street to the other, the record shows that this tunnel was not accessible at the time of Edward's death. The record shows that the fenced lot was for construction employees only, and a sign on the fence at the time of Edward's death read, "construction area" and "unauthorized personnel keep out." The record also shows that Waldinger stored construction materials in the fenced lot and that throughout the day, Waldinger employees would cross 13th Street to retrieve those materials.

By providing parking directly across 13th Street from the worksite, Waldinger created a condition under which its employees would necessarily encounter hazards while traveling to the premises where they worked. Fruehwald testified that he was aware of the danger inherent in crossing 13th Street that

existed at the time of Edward's accident. Given this evidence, there is a distinct, causal connection between Waldinger's encouragement of its employees' use of the fenced lot and the occurrence of Edward's injury.

Waldinger argues that even if this is true, the trial court erred in determining that Edward was in the course of employment at the time he was killed, because Edward crossed the street a half hour before he was to start work. In support of its argument, Waldinger states that although the court considered the start of work to be 5:50 a.m., the evidence shows that work started at 6 a.m. Our review of the record shows that although the plumbers were not paid for work prior to the 6 a.m. start time, they were required to report to work at approximately 5:50 a.m. to receive their job assignments for that particular day. Dimmitt testified that he met with employees prior to 6 a.m. and that if an employee reported to work at 6 a.m., he or she was considered late. Given this evidence, we conclude that Edward was at the jobsite within a reasonable time prior to 5:50 a.m. Therefore, the trial court did not err in finding that Edward was in the course of his employment at the time of his fatal accident.

Lastly, Waldinger argues that the trial court erred in failing to find that Edward was willfully negligent and that his negligence was sufficient to make his injury and death noncompensable. Waldinger contends that having knowingly and deliberately chosen to jaywalk, Edward ought to have been found willfully negligent.

As previously stated, the record shows that all Waldinger employees, including Waldinger's foremen, crossed directly across 13th Street from the fenced lot to the Waldinger trailers. Although there was a traffic signal approximately one and a half blocks to the south at Capitol Avenue, the witnesses at trial testified that they never used that intersection with 13th Street as a crossing or saw anyone else do so. For this reason, the trial court did not err in failing to find that Edward was willfully negligent at the time of his accident.

Pursuant to Neb. Rev. Stat. § 48-125 (Cum. Supp. 2000), Carol has requested an award of attorney fees in this appeal. In accordance with § 48-125, Carol is entitled to attorney fees because Waldinger failed to obtain any reduction in Carol's award.

However, Carol has not yet filed a motion for the allowance of attorney fees, supported by an affidavit which justifies the amount of the fee sought for services in the appellate court, as required by Neb. Ct. R. of Prac. 9F (rev. 2000). Accordingly, we are unable to award attorney fees at this time.

## CONCLUSION

After reviewing the record, we conclude that the trial court did not err as a matter of law in finding that Edward's fatal accident arose out of and occurred in the course of Edward's employment with Waldinger. Therefore, we affirm the order of the review panel affirming the trial court's order as modified.

AFFIRMED.